## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRADLEY C. BIRKENFELD**<br>FPC Schuylkill<br>P.O. Box 670<br>Minersville, PA 17954<br><br>　　**Plaintiff/Counterclaim Defendant,**<br><br>　　**v.**<br><br><br>**SCHERTLER & ONORATO**<br>575 7TH Street, NW<br>Suite 300 South<br>Washington, D.C. 20004<br><br>　　**Defendant/Counterclaimant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　**Case No. 1:11-cv-01529-RLW**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT SCHERTLER & ONORATO'S
## ANSWER TO COUNT V AND COUNTERCLAIM

Pursuant to Super. Ct. Civ. R. 12(b)(6), all Defendants have moved to dismiss Counts I, II, III, IV, VI and VII of the Complaint.  The individual Defendants have also moved to dismiss Count V of the Complaint.  Accordingly, Defendant Schertler & Onorato alone submits this Answer to Count V of the Complaint as well as a Counterclaim against Plaintiff Bradley C. Birkenfeld.

Defendant, by undersigned counsel, denies all allegations of the Complaint for which it is without knowledge or information sufficient to form a belief, and answers the allegations in the Complaint as follows:

1.      Admitted that Plaintiff is "widely known as the Whistleblower who exposed UBS AG along with 19,000 United States clients in a conspiracy to evade taxes."  All other allegations are denied.

2.      Denied that Plaintiff is proceeding pro se.  The other allegations in this paragraph are legal conclusions of the Plaintiff to which no response is required.

3.      Defendant lacks sufficient information to admit or deny the allegations with respect to Plaintiff's former address.  The other allegations are admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted that Peter Taylor was an attorney at Schertler & Onorato from 2006 until 2009.  He is now an Assistant United States Attorney for the District of Columbia.

9.      Denied.

10.     Denied.

11.     Admitted that venue is proper in this District.

12.     This is a legal conclusion of the Plaintiff to which no response is required.

13.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13.

14.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14.

15.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15.

16.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16.

17.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17.

18.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18.

19.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19.

20.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20.

21.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21.

22.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22.

23.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23.

24.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24.

25.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25.

26.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26.

27.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.

28.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

29.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

30.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30.

31.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31.

32.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32.

33.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33.

34.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34.

35.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35.

36.     Denied.

37.     Denied.

38.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38.

39.     Admitted that Plaintiff met voluntarily with Kevin Downing, Karen Kelly and Matthew Kutz on June 12, 2007.  All other allegations are denied.

40.     Admitted that Plaintiff, through counsel, requested a subpoena.

41.     Admitted that DOJ Tax Division did not provide Plaintiff a subpoena in response to the request at the June 12, 2007 meeting.

42.     Admitted that Plaintiff, through counsel, delivered internal UBS documents to the IRS and DOJ Tax Division

43.     Admitted

44.     Denied that Plaintiff initiated contact.

45.     Admitted that Birkenfeld received subpoena EO2731 from the Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs.

46.     Admitted that Plaintiff met with Thomas D. Silverstein and Laura Josephs of the United States Securities and Exchange Commission on November 14, 2007.  The suggestion that Plaintiff did so alone is denied.  Defendant David Dickieson attended the meeting with Plaintiff.

47.     Admitted.

48.     Plaintiff's characterization is denied.

49.     Admitted that Plaintiff met with these individuals, along with Defendant Danny Onorato.

50.     Denied.

51.     Denied.

52.     Admitted that Defendant Danny Onorato attended the meeting on May 8, 2008. All other allegations are denied.

53.     Denied.

54.     Admitted that Defendant Danny Onorato sent the email dated July 3, 2008 and attached as Exhibit 1 to the Complaint.  All other allegations are denied.

55.     Plaintiff's characterization of the email is denied. The email speaks for itself.

56.     Plaintiff's characterization of the email is denied.  The email speaks for itself.

57.     Plaintiff's characterization of the email is denied.  The email speaks for itself.

58.     Admitted that Plaintiff met with the Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs in July 2008 along with Defendant Danny Onorato. All other allegations are denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

## COUNTS I-IV

66-74.  The allegations in these paragraphs are addressed in Defendants' Motion to Dismiss which is filed contemporaneously with this Answer to Count V and Counterclaim.

## COUNT V

75.     Defendant's responses to the allegations in paragraphs 1-74 of the Complaint are incorporated by reference.

76.     Denied.

77.     Denied.

## COUNTS VI AND VII

78 - 82.  The allegations in these paragraphs are addressed in Defendants' Motion to Dismiss which is filed contemporaneously with this Answer to Count V and Counterclaim.

83.     Defendant denies that Plaintiff is entitled to any of the relief requested.

84.     All allegations of the Complaint not specifically admitted or denied are hereby denied.

## AFFIRMATIVE DEFENSES

1.     Count V of the Complaint fails to state a claim upon which relief can be granted.

2.     All of Plaintiff's claims are barred by the applicable statute of limitations.

3.     Plaintiff assumed the risk.

4.     Plaintiff has waived asserted breaches.

5.     The Complaint is barred by Plaintiff's fraud.

6.     The Complaint is barred by Plaintiff's illegal conduct.

## REQUESTED RELIEF

Defendant respectfully requests that this Court enter judgment against Plaintiff, dismiss Count V of the Complaint with prejudice, and grant such other and further relief as the Court deems just and proper, including costs and attorneys' fees.

## COUNTERCLAIM

Pursuant to Fed. R. Civ. P. 13, Counterclaimant Schertler & Onorato ("Counterclaimant") files this Counterclaim against Counterclaim Defendant Bradley C. Birkenfeld ("Birkenfeld") and alleges the following:

## PARTIES

1.        Counterclaimant Schertler & Onorato, LLP is a limited liability partnership

formed to provide legal services in the District of Columbia and elsewhere in the United States.

Its principal place of business is 575 7th Street, N.W., Suite 300 South, Washington, D.C. 20004.

2.        Counterclaim Defendant Bradley C. Birkenfeld is currently incarcerated in

Minersville, Pennsylvania.  Although he resided in Switzerland and had permanent residence

status for several years before his arrest, he remains a citizen of Massachusetts.  Upon

information and belief, his legal address is: 61 Broad Reach, Unit T122B, Weymouth, MA

02191.

## JURISDICTION AND VENUE

3.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

the amount in controversy exceeds $75,000 and the litigation is between citizens of different

states.

4.        Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the

events or omissions giving rise to the counterclaim occurred in the district and a substantial part

of the property that is the subject of the action is situated here.

## BACKGROUND

5.        On or about April 19, 2006, Birkenfeld met with David Schertler to discuss the

possibility of retaining Schertler & Onorato to represent him in the United States in connection

with his allegations that his former employer, UBS AG, was engaged with thousands of its U.S.

clients in a conspiracy to evade U.S. taxes.

6.      Birkenfeld wanted to serve as a whistleblower, expose UBS AG's activities to the United States government, and reap the considerable financial rewards that could result from his whistleblower claims.

7.      Schertler and other attorneys at Schertler & Onorato met with Birkenfeld numerous times and conducted other interviews with him over the telephone subsequent to April 19, 2006.

8.      Birkenfeld did not provide the Schertler & Onorato attorneys with complete information about the extent of his illegal conduct and activities during these interviews.

9.      As Counterclaimant came to learn, Birkenfeld was not an innocent pawn in the conspiracy.

10.     As a Senior Client Advisor at UBS AG in Switzerland, Birkenfeld helped clients in the U.S. avoid taxes by concealing their assets held in offshore accounts using nominee and sham entities.

11.     With Birkenfeld's help, at least one of these clients avoided taxes on the income earned on more than $200 million that he had deposited in overseas banks.   (See Statement of Facts filed in support of Birkenfeld's Plea Agreement, Exhibit 1 to this Answer and Counterclaim)

12.  Upon information and belief, Birkenfeld continued to personally evade U.S. taxes on his own income using these and other schemes, while failing to disclose this information to his attorneys.

13.     Pursuant to Birkenfeld's request, Counterclaimant began researching potential avenues to advance a whistleblower claim for Birkenfeld.

14.     In December 2006, Congress amended the tax code to encourage IRS whistleblowers by making awards mandatory rather than discretionary.  It provided that successful whistleblowers "shall" recover between 15 and 30% of the proceeds collected by the IRS as a result of their information.  The statute required the IRS to establish a Whistleblower Office to implement the law.  P.L. 109-432, Div. A, Title IV, § 406(b), 120 Stat. 2959 (Dec. 20, 2006).  *See also*, 26 U.S.C. § 7623(b); IRS website:

http://www.irs.gov/compliance/article/0,,id=180171.html.

15.     When advised by Counterclaimant of the new whistleblower statute, Birkenfeld was eager to participate in the program.

16.     Birkenfeld also wanted immunity from prosecution from the United States Department of Justice for his own criminal conduct and activities.

17.     This immunity could only come from the Department of Justice as neither the IRS Whistleblower statute nor the regulations implementing it provide any authority for granting immunity from the Department of Justice.  *See,* 26 U.S.C. § 7623; 26 C.F.R. § 301.7623-1; Information provided at http://www.irs.gov/compliance/article/0,,id=180171,00.html.

18.     Without identifying Birkenfeld, and with his consent, Counterclaimant began communicating with attorneys at the Tax Division of the Department of Justice and then with representatives of the new IRS Whistleblower Office in an effort to accomplish Birkenfeld's twin goals of making a whistleblower claim and securing immunity from prosecution for his own criminal conduct.

19.     At this time, the IRS Whistleblower Office was so new that even those in the office were not sure how the process would work.  In addition, the IRS Whistleblower Office and the Department of Justice were still figuring out how to coordinate their activities.

20.     On February 5, 2007 and April 17, 2007, Counterclaimant made a proffer to Kevin Downing and Karen Kelly, attorneys with the Tax Division of the Department of Justice, along with Agent Matthew Kutz of the Internal Revenue Service.  Without identifying Birkenfeld or UBS AG, the Schertler & Onorato attorneys laid out the type of information that Birkenfeld was willing to provide and they requested immunity for their client.

21.     Throughout the spring of 2007, Counterclaimant continued to press the attorneys at the Tax Division for immunity for their anonymous client, but the Tax Division would not agree to provide immunity.

22.     Eventually, despite the Tax Division's refusal to grant immunity at this point, Birkenfeld agreed  that he would meet with Kelly and Downing on June 12, 2007.

23.     On June 6, 2007, Kevin Downing and Karen Kelly emailed Counterclaimant a proffer agreement with respect to the June 12 meeting.  In their cover letter, they stated:

> You have also made clear that your client desires to participate in the Internal Revenue Service's Whistleblower Reward Program ("Program").  As previously stated, the Department of Justice does not, in any way, participate in the Program. The Program is exclusively within the jurisdiction and control of the Internal Revenue Service.

24.     Kelly continued to refuse to coordinate her activities with the IRS Whistleblower Office.  As a result, Counterclaimant contacted the IRS Whistleblower Office directly.

25.     On June 11, 2007, Dickieson spoke with Joe Hebb, senior analyst in the Whistleblower Office.  Hebb said that he would contact Matthew Kutz, the IRS Special Agent working with Kelly and Downing.

26.     As late as the afternoon of June 11, it appeared that the meeting with the Tax Division attorneys might not happen.  At 1:17 that afternoon, IRS Special Agent Kutz emailed Dickieson:

I have been informed that you consider our meeting tomorrow cancelled.  Please confirm your intentions, so that we can plan accordingly.

27.    Dickieson responded:

We are meeting today with the client to determine how we can go forward with the proffer without any of the written assurances that we have requested.  I have been in touch with the Whistleblower's Office and in my latest conversation with Mr. Joe Hebb, I was informed that the Whistleblower Office will consider any information provided during a meeting where you are present to qualify for treatment as information provided to the IRS under the Whistleblower Program.  As you know, this is contrary to what we were advised last week by the DOJ and was a major factor in allowing us to move forward.  We have sorted through these conflicting pressures and have decided to move ahead with tomorrow's proffer meeting.

As recommended by Mr. Hebb, we will bring to the meeting a completed IRS Form 211 which will be provided to you at the start of the meeting.

(Exhibit 2 to this Answer and Counterclaim).

28.    Schertler & Onorato attorneys David Schertler, Peter Taylor, and David

Dickieson met with Birkenfeld on the afternoon of June 11, 2007.  They explained the

communications with Kelly and Downing and with the IRS Whistleblower Office and detailed

the risks of proceeding with the proffer.

29.    During the June 11, 2007 meeting, Schertler explicitly advised Birkenfeld of the

risks of meeting with the IRS and DOJ Tax Division without immunity.

30.    Despite Schertler's advice, Birkenfeld decided to proceed with the June 12, 2007

meeting.

31.    On June 12, 2007, Birkenfeld, David Schertler, and David Dickieson met with

Downing and Kelly.  Special Agent Kutz attended on behalf of  the IRS.

32.    As instructed by Joe Hebb, Dickieson brought with them a completed Form 211 –

the form that initiates a whistleblower claim with the IRS – which they hand-delivered to Special

Agent Kutz.

33.     At the June 12, 2007 meeting, Birkenfeld signed a proffer agreement which clearly stated that the government was not offering immunity to Birkenfeld and was making no representations as to whether it would offer immunity or a non-prosecution agreement in the future.

34.     With the assistance of Counterclaimant, Birkenfeld continued to provide valuable information including documents to Downing, Kelly, and Kutz during the summer of 2007.

35.     However, Birkenfeld refused to provide information regarding his own clients without a subpoena from the Department of Justice as he was concerned about violating Swiss law governing bank secrecy.

36.     In addition, he was unwilling to provide complete information regarding his own activities without immunity from the Department of Justice.

37.     Counterclaimant pressed the Tax Division for a subpoena and for immunity for their client so that he could continue to provide them with information.  However, the Tax Division attorneys refused to issue the subpoena or to grant immunity to Birkenfeld.

38.     Accordingly, at the end of August 2007, Birkenfeld instructed his attorneys to discontinue his proffer meetings with the IRS and the Tax Division.

39.     On behalf of Birkenfeld, David Dickieson then initiated contact with the United States Senate and the Securities and Exchange Commission in order to gain additional recognition of the importance of the information that Birkenfeld was willing to provide and to try to protect his status as a whistleblower.

40.     At the request of Dickieson, the Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs issued a

13

subpoena to Birkenfeld, and Birkenfeld testified at length before staff members of the Committee on October 11, 2007 about the tax evasion conspiracy at UBS AG.

41.     On October 14, 2007, Birkenfeld, represented by Dickieson, met with the Branch Chief of the Enforcement Division of the SEC and provided further information regarding UBS AG's activities.

42.     On October 23, 2007, David Schertler sent Birkenfeld a revised retainer letter which Birkenfeld signed on November 22, 2007.  The agreement covered the firm's representation of Birkenfeld "in connection with whistleblower activity against your former employer, UBS and potential violations of the law by UBS."  It provided:

> Our representation under this agreement includes representing you in meetings and in communications with United States law enforcement entities and government investigatory bodies, such as the Senate's Permanent Subcommittee on Government Investigations.  It does not include any litigation, criminal or civil, that may arise in connection with these efforts.

The agreement specified that Birkenfeld would pay Schertler & Onorato attorneys a reduced hourly rate of $225 for partners and senior counsel and $150 per hour for associates and cap the hourly fees at a maximum of $80,000.

43.     In addition, the agreement provided that Schertler & Onorato would receive 12.5% of the gross amount of any reward that Birkenfeld received as a result of his whistleblowing claims against UBS and other taxpayers.  (Exhibit 3 to this Answer and Counterclaim)

44.     On May 6, 2008, Birkenfeld flew to the United States from Switzerland to attend a school reunion and to meet further with the Senate and the SEC.  He was arrested at Logan Airport.

45.     Kevin Downing informed David Schertler of Birkenfeld's arrest.  Danny Onorato immediately flew to Boston to meet with Birkenfeld and Downing.

46.     Downing made clear that he believed that Birkenfeld had lied to the Department of Justice regarding his own behavior.

47.      Onorato was able to secure Birkenfeld's release based in part on the condition that they travel to Washington, D.C. to meet further with Downing to provide additional information regarding UBS AG and Birkenfeld's actions in connection with the tax evasion conspiracy.

48.     Onorato and Birkenfeld met with Downing and others at the Department of Justice on May 8, 2008 and Onorato worked throughout the month to negotiate a plea agreement for Birkenfeld.

49.     In connection with these these discussions, Birkenfeld continued to provide information to the government attorneys.

50.     On May 9, 2008, Birkenfeld signed a second retainer agreement with Schertler & Onorato "in connection with [his] pending criminal case out of the Southern District of Florida." It applied to "any and all work done in connection with the criminal matter, beginning on Tuesday, May 6, 2008 . . . "   It provided that the attorneys would be paid at their normal hourly rates ($425 per hour for partners) for work done on the criminal matter.  (Exhibit 4 to this Answer and Counterclaim).

51.     On May 30, 2008, Birkenfeld agreed to plead guilty to one count of conspiracy to defraud the United States.

52.     In connection with his plea, he signed a Statement of Facts which described in detail his involvement in assisting his clients to evade taxes on millions of dollars of income

while he was a private banker at UBS AG and other banks.  (Exhibit 1 to this Answer and Counterclaim).

53.     On August 29, 2008, Birkenfeld notified Counterclaimant that he had hired the Boston firm of Todd & Weld to represent him in his "ongoing legal case with the U.S. Government."

54.     Counterclaimant continued to retain a contingent fee interest in any reward obtained as a result of Birkenfeld's whistleblower activities, even after successor counsel was retained.

55.     At the time Birkenfeld hired new counsel, he also owed Counterclaimant $77,024 in hourly fees.

56.     In February 2009, UBS AG entered a Deferred Prosecution Agreement with the Department of Justice and agreed to pay $780,000,000 as part of the settlement.  Individual clients have also agreed to pay the government millions of dollars in unpaid taxes.

57.     Birkenfeld was sentenced on August 21, 2009.  He was represented at sentencing by David Meier of Todd & Weld. Birkenfeld received a sentence of 40 months – 10 months longer than the sentence requested by the Department of Justice

58.     During sentencing, Downing made clear that the United States viewed Birkenfeld as the critical whistleblower without whom the United States would never have discovered the massive tax fraud conspiracy by U.S. taxpapers and UBS.

59.     Moreover, Downing clearly stated that Birkenfeld approached the government and provided this critical information during the period that he was represented by Counterclaimants. Downing stated to the Court:

>     **Mr. Downing**: Prior to his arrest, and in particular in the summer of June of 2007, Mr. Birkenfeld came to the Department of Justice and started to lay out

the parameters of this fraud scheme, gave some information about the individuals at UBS that were involved, including managers and executives, and talked in rather detailed fashion about the parameters of the scheme and how it was conducted.

Mr. Birkenfeld <u>at that time</u> also provided documents to the United States government.  <u>So in June – as of June 2007</u>, the United States government was in a position to approach UBS, to request that they begin to provide information to the United States government about this fraud scheme, and that in fact did occur.

. . .

**Mr. Downing**: I will say that <u>without Mr. Birkenfeld walking into the door of the Department of Justice in the summer of 2007</u>, I doubt as of today that this massive fraud scheme would have been discovered by the United States government.

. . .

**The Court**:  Have the identities of other U.S. citizens been disclosed as a result of Mr. Birkenfeld's assistance?

**Mr. Downing**:  They have . . . and in our letter we indicated currently there is approximately 150 United States taxpayers under investigation as a result of the initial disclosures made by Mr. Birkenfeld about this massive tax fraud scheme perpetrated by UBS and others.

. . .

**The Court**:  How is it that Mr. Birkenfeld came to the government?

**Mr. Downing**: . . .  <u>I do know we were contacted by lawyers.  I do know when Mr. Birkenfeld came in the door he – he seemed to be motivated and – which is a good thing by the new whistle blower statute that applies to tax cases</u>.

. . .

**The Court**: . . . But again but for Mr. Birkenfeld this scheme would not have been discovered by the United States government.

**Mr. Downing**:  I believe that Your Honor, yes.

(Transcript of Birkenfeld Sentencing Hearing, 8/21/09, pp. 10-15, Exhibit 5 to this Answer and Counterclaim)(emphasis added).

60.     As the IRS whistleblower responsible for the United States' collection of $780,000,000 from UBS AG, Birkenfeld could potentially receive between $117,000,000 and $234,000,000.  This number could be far greater depending on the amounts recovered from individual clients.

61.     In late 2009, months after his sentencing – months after Downing had acknowledged the critical importance of Birkenfeld's actions as a whistleblower while represented by Counterclaimant -- Birkenfeld retained the firm of Kohn, Kohn & Colapinto to represent him.

62.     On December 2, 2010, David Colapinto of Kohn, Kohn & Colapinto wrote Counterclaimant and demanded that Schertler & Onorato "confirm in writing that your firm does not assert any financial interest in any whistleblower claim that Mr. Birkenfeld may have. . . " (Exhibit 6 to this Answer and Counterclaim).

63.     On December 18, 2010, Schertler responded by saying that Counterclaimant would not waive its financial interest in any recovery by Birkenfeld. (Exhibit 7 to this Answer and Counterclaim).

64.     On July 22, 2011, Kohn, Kohn & Colapinto filed a Bar Complaint against Counterclaimant and the individual defendants in this case with the D.C. Office of Bar Counsel. The Bar Complaint raised a host of specious allegations in a transparent effort to force Counterclaimant to abandon its claim to 12.5% of Birkenfeld's anticipated multi-million dollar whistleblower recovery from the IRS.

65.     On August 24, 2011, Birkenfeld filed the instant "pro se" action against Counterclaimant and the individual defendants in furtherance of the ongoing campaign to preclude Schertler & Onorato from recovering its share of Birkenfeld's whistleblower recovery.

66.     Finally, on August 25, 2011, Birkenfeld filed another "pro se" Complaint in Superior Court for the District of Columbia again asserting malicious and unfounded claims of malpractice and breach of fiduciary duty against the Schertler & Onorato attorneys.  Although the Bar proceedings are meant to be confidential, Birkenfeld attached a copy of the Bar

Complaint filed by Kohn, Kohn & Colapinto to the Superior Court complaint.  The Superior

Court Complaint is utterly without merit and Counterclaimant and the individual attorney

defendants have moved to dismiss it in full.

67.     Counterclaimant believes that the sudden burst of activity by Birkenfeld's

attorneys at Kohn, Kohn & Colapinto and by Birkenfeld himself may indicate that they know or

believe that he will soon receive at least some portion of the IRS whistleblower award.

68.     Birkenfeld is a sophisticated international financial advisor and has expressed

openly in the press his desire to live abroad after his confinement.

69.     There is a very strong likelihood that Birkenfeld will convey or secrete any

money he receives as a result of his whistleblower activities in order to prevent any recovery by

Counterclaimant of its share of such an award.

## COUNT I – BREACH OF CONTRACT

70.     Counterclaimant reasserts and incorporates by reference all of the allegations in

paragraphs 1-69 above.

71.     At the time that Birkenfeld terminated the two retainer agreements with

Counterclaimant, he owed $77,024 in hourly fees under the two contracts.

72.     Birkenfeld has failed to pay these fees.

73.     By refusing to pay these fees, Birkenfeld breached the October 23, 2007 retainer

agreement and the May 9, 2008 retainer agreement.

74.     Counterclaimant is entitled to the $77,024 in hourly fees billed under its retainer

agreements with Birkenfeld.

## COUNT II – BREACH OF CONTRACT

75.     Counterclaimant reasserts and incorporates by reference all of the allegations in paragraphs 1-69 above.

76.     The October 23, 2007  retainer agreement was a valid contract relating to Counterclaimant's representation of Birkenfeld in connection with his whistleblower claims.

77.     Counterclaimant substantially performed under the contract.

78.     Counterclaimant was not terminated for cause.

79.     As a result of the substantial work done by Counterclaimant in representing Birkenfeld in connection with his whistleblower claims, Birkenfeld now stands to recover millions of dollars from the United States.

80.     Counterclaimant is entitled to its full contingency fee of 12.5% of the gross amount of any whistleblower recovery that Birkenfeld receives.  *Kaushiva v. Hutter,* 454 A.2d 1373 (D.C. 1983); *Greenberg v. Sher,* 567 A.2d 882, 885 (D.C. 1989).

## COUNT III
## QUANTUM MERUIT

81.     Counterclaimant reasserts and incorporates by reference all of the allegations in paragraphs 1-69 above.

82.     The October 23, 2007  retainer agreement was a valid contract relating to Counterclaimant's representation of Birkenfeld in connection with his whistleblower claims.

83.     Counterclaimant substantially performed under the contract.

84.     Counterclaimant was not terminated for cause.

85.     As a result of the substantial work done by Counterclaimant in representing Birkenfeld in connection with his whistleblower claims, Birkenfeld now stands to recover millions of dollars from the United States.

86.     Counterclaimant is entitled to its full contingency fee of 12.5% of the gross amount of any whistleblower recovery that Birkenfeld receives.  *Kaushiva v. Hutter,* 454 A.2d 1373 (D.C. 1983); *Greenberg v. Sher,* 567 A.2d 882, 885 (D.C. 1989).

## COUNT IV
## QUANTUM MERUIT

87.     Counterclaimant reasserts and incorporates by reference all of the allegations in paragraphs 1-69 above.

88.     Counterclaimant substantially performed  the termination of its retainer agreements.

89.     As a result of the substantial work done by Counterclaimant in representing Birkenfeld in connection with his whistleblower claims, Birkenfeld now stands to recover millions of dollars from the United States.

90.     Counterclaimant is entitled to the reasonable value of its legal services under the doctrine of *quantum meruit*.   The reasonable value of Counterclaimant's fees is at least 12.5% of the gross amount of any of the gross amount of any whistleblower recovery that Birkenfeld receives.

## PRAYER FOR RELIEF

91.     WHEREFORE, Counterclaimant prays that this Court grant them the following relief:

(a)     enter a declaratory judgment that Counterclaimant is entitled to 12.5% of the gross amount of any whistleblower recovery that Birkenfeld receives;

(b)     award Counterclaimant damages of 12.5% of the gross amount of any whistleblower recovery that Birkenfeld receives;

    (c)  award Counterclaimant $77,024 in hourly fees due under its two retainer

agreements;

    (d)  direct the Internal Revenue Service, United States Department of Justice,

and any other department or agency of the United States to pay 12.5% of any funds to be paid to

Birkenfeld pursuant to the IRS Whistleblower statute, 26 U.S.C. § 7623 plus an additional

$77,024 directly to Counterclaimant Schertler & Onorato;

    (e)  award Counterclaimants their reasonable attorneys' fees and costs;

    (f)  order such other relief as this Court deems just and proper.

      Respectfully submitted,


       <u>        /s/        </u>
      Mark London  #293548
      mlondon@londonandmead.com
      Christopher B. Mead  #411598
      cmead@londonandmead.com
      D. Bradley Clements #422048
      bclements@londonandmead.com
      London & Mead
      1225 19th Street, N.W., Suite 320
      Washington, D.C. 20036
      T: (202) 331-3334
      F: (202) 785-4280

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY on this 21st day of October, 2011, that a copy of the foregoing Answer to Count V and Counterclaim was mailed, postage prepaid to:

Bradley C. Birkenfeld
FPC Schuylkill
PO Box 670
Minersville, PA 17954

/s/
Mark London